Today's case is number 24-1279, Brian Hussey v. City of Cambridge et al. At this time, would counsel for the appellant come to the podium and introduce himself on the record to begin? Thank you and may it please the court. My name is Jack Bartholet and I have the honor of representing the plaintiff appellant in this matter, Sgt. Brian Hussey. Could you speak a little bit louder and maybe make the mic a little closer to yourself? Great.  Thank you. Chief Judge Barron, with the court's permission, I'd like to reserve three minutes for rebuttal. You may.  Hussey posted a mainstream but locally unpopular political view and was disciplined for it. This is not and cannot be consistent with the First Amendment. Sgt. Hussey, a 28-year veteran of the Cambridge Police Department, believed it was inappropriate for Congress to name an important and needed landmark federal police reform bill after someone with such an extensive criminal record rather than the type of heroes such bills are normally named after. As he told his superiors from day one, he was horrified by what happened to Mr. George Floyd and maintained that the officers involved in his murder should be fully prosecuted. Sgt. Hussey simply believed naming the bill after Mr. Floyd was inappropriate and he expressed that on his private Facebook page. But because the police commissioner personally disagreed with the viewpoint of Hussey's political message, and despite there being absolutely no evidence of disruption caused by the post at any point in time, which was posted using Hussey's personal cell phone while he was off duty and at home, restricted to Facebook friends Hussey personally knew, and deleted by Hussey after just two hours, Commissioner Bard first placed Hussey on administrative leave for two months, depriving him of significant pay from overtime and detail opportunities, during which there was still never any disruption, and then suspended him for four days after an investigation that consisted entirely of interviewing solely Mr. Hussey one time. This is constitutionally impermissible, and I'd like to make four points as to why this court should reverse. First with defendants recent concession now that the First Amendment value of Sgt. Hussey's speech is not artificially lessened by the so-called vulgarity penalty, it is undisputed that the First Amendment value of Hussey's speech is at the literal zenith described by Supreme Court case law. He was commenting solely upon pending federal legislation that directly related to his professional expertise and did not delve into the policies or practices of his employer or workplace during a heightened political climate. That puts his speech squarely at the very top of the First Amendment hierarchy and requires the employer to prove that an even more substantial countervailing disruption weight exists on the other side of the Pickering scale. Indeed, the Supreme Court counsel... I'd like to ask you about the point that you just made about proof of a substantial disruption. In your brief, you say that the test for proving that substantial disruption must be concrete, evidence-based, particularized, and articulable. Is that a fair... Yes, Your Honor. Okay. In the amicus briefs, in addressing what they call the operational prerequisites for effective policing, they describe the way in which police departments generally rely upon what they describe as the eyes and ears of the public of police officials. They describe these kinds of interactions with the public. Reports of crimes and emergencies, requests of assistance from neighbors, suggestions for better patrolling routes, identifying suspects, giving witness statements, and calls in non-emergencies. What kind of concrete, particularized, articulable proof would the department have to offer to establish disruption with those kinds of interactions with the public? Well, sure. So, Your Honor, the disruption needs to be related either to the operations of the employer generally or the day-to-day operations of the employee. And so it needs to show some sort of disruption to either what Officer Hussey did on a day-to-day basis or that was prevalent throughout the department. But the point being, what we've seen in other cases are evidence of insubordination or evidence that would disrupt the close working relationships in the department. And I note that in Pickering, the Supreme Court held... We don't have that here. That's clear. Right. And I think that's part of the reason why they fail under the Pickering balance. Is it the whole of the reason? I think it's part of the reason. Okay. Well, let's get to the part that then is relevant. Sure. Which is, I think, Judge Lopez's question, which is the interactions with the public. And there's a reasonable prediction test. And the question is to satisfy that test when the concern is that the statement, and here it's the derogatory statement, druggie, or what was deemed to be a derogatory statement, whether that way of characterizing a class of actors will lead to a breakdown in trust with the community when they have these types of interactions. Are you just saying that is just never a reasonable prediction? And we argue, and I think it's backed up by a litany of citations, we argue that this is not, of course, inherently vulgar. We've argued in our brief, and I think this is correct, that... Take a word that is, but just think of it as a slur or a purely derogatory means of describing a segment of the community. Can you make a reasonable... What evidence do you think would there have to be to back up a reasonable prediction that that will undermine the trust with the community and thereby negatively affect interactions between the public-facing officer and the public in the types of circumstances Judge Lopez is describing? Sure. The department needs to conduct some level of investigation to determine how the statement would impact its operations. Here, there's no investigation other than asking Officer Hussey and then writing up a report. If there's a truly derogatory statement that attacks people on the basis of an immutable characteristic, that could be evidence that it would have a propensity for disruption, but it still needs to be backed up by an analysis of how might it disrupt. Like what? Well, it's sort of... Essentially, you're asking what facts would allow the department to overcome Hussey's speech. I think we start by doing the balancing analysis, which says you take first the weight of Hussey's speech, and here it's at the very easy net. The Supreme Court has said that rarely, if ever, will any justification overcome such speech, but even if... Let's get specific. So do they have to provide, pursuant to your test, specific examples of individuals who chose not to call upon the police in emergency because they were offended by a particular post in this incident? Do they have to show specific instances where confidential informants that they had relied upon in the past were no longer willing to work with them? Do they have to show specific instances that they were unable to find cooperating witnesses to pursue a charge? Is that the kind of particularity you're suggesting the department has to bring forth in order to establish a reasonable prediction of disruption in these kind of interactions with the community? Your Honor, all of those would be cognizable disruption interests, but it's a constellation of potential disruption interests. But you've had none of that. Are you saying you cannot make a reasonable prediction? Here, I think... Not here. I'm saying the absence of those, we don't have those here. So you're saying that, therefore, you lose. I'm sorry, I don't follow, Your Honor. We don't have those here, and therefore, the department loses. That's your position?  So you have to have those? Well, Waters requires that there's an investigation into disruption and that there's concrete evidence of either proffers of disruption that has happened. We're asking what those have to be, and are you saying that has to be some person in the community saying, because of this, I won't interact with the police? I think it needs to be either somebody in the community or, more poignantly, somebody in the department saying it's hard to work with this officer. Counsel, I think the struggle is you keep returning to internal disruption, but this case is about external disruption, and it's also about the city predicting disruption. So I think what we're trying to get your help on is how do you think we should do the analysis in a case that's about external disruption? So let's put internal disruption to the side, and where the city is predicting that there could be external disruption and loss of public trust with certain people in the community because of comments that are derogatory. What do you think would be the type of evidence that a city would have to present for us to be able to conclude that their prediction of external disruption was reasonable, and therefore, we should give it deference? Thank you, Judge Rickleman. I think you need to look at, again, the categories that the Supreme Court has identified and find evidence back on. So those categories would be disruption to the close working relationships in the department. But how do most of those, and tell me if I'm wrong, but the Supreme Court cases are generally about internal disruption, and this isn't about that. So how do those factors map on when what we're analyzing is external disruption, is the close working relationship, the close working relationship of community members? It might be. So, for example, if you were to have a specific confidential informant that you rely on often, and there's evidence that the comments would cause this confidential informant to no longer work with the police department, that could be evidence of impairing the close working relationship. Just so I could follow, take the lower court decision where there's the racist float, and the cop is in the racist float in the parade. In that instance, if there's no officer who said, I minded it, I'm happy to work with him, doesn't bother me in the least. And the police chief says, well, I think that really undermines the trust in the community. I don't want my officers doing that. Are you saying that the officer cannot be fired for that conduct? Your Honor, I think you're referring to LaCourga. I'm drawn from LaCourga, but in my example, are you saying the officer could not be fired for that conduct? If there's widespread media coverage like there was in Lucerto, then yes, that implies.  Because Lucerto is not opposition to a political belief. It's opposition. And that's based, and we know that because what they're responding to is the widespread controversy that's generated by others. Yes. So in this case, why couldn't the commissioner, knowing it got beyond the range of the individuals who were initially sent it, knowing that some members of the community representing organizations who are representatives of the community have raised the concern about it, make the reasonable prediction that this will get out into the community and have a negative effect? What's different between this and that case? So there's a lot wrapped up in that. So let me start with the getting out beyond the Facebook page, which is, you look at the employee's post at the time it's posted. Rankin, for example, was speaking, the consular officer was speaking with a boyfriend and  It still got out to the Secret Service, to Rankin's mother, obviously eventually to the press and all that. But the Supreme Court said, well, this is an isolated conversation. So that's point one. Suppose he wrote it that same language, but it was written in editorial in the Cambridge Chronicle. Yes. Okay. So that issue, totally it's public. With respect to disruption, I took you to be suggesting there might still be a problem in showing that that type of public communication would be disruptive. Am I wrong about that? No, because that's a picker. So then with respect to the disruptive aspect of it, if all that happens is it's published in the paper, and then the head of NWC comes into the commissioner's office and says, I saw this, it concerns me. Could the commissioner, in response, say, I think this is going to be disruptive. It undermines our mission. And fire him. I take it you say no. Right. Okay. So to Judge Rickleman's question, what is lacking with respect to the reasonable prediction of the disruptive impact of that? What's lacking is a concrete impact on the actual operations of the department. When you say concrete, what are you looking for? So again, an informant who won't work with the police, officers who don't press this officer enough to back him up. My last question on that is, how does that connect up with the prediction aspect of the test? So again, a lot wrapped in there. I want to address the community group. Let's answer this piece of it. Because you're saying, I understand that you could say you would be satisfied if there was a concrete impact. But as Judge Rickleman asked you, the test is, is there a reasonable prediction of disruption? Right. Well, if you're predicting, presumably it doesn't have to have yet happened. What could support the prediction? The prediction needs to be based on evidence being non-speculative. Roe says it needs to be far more than mere speculation. So it would need to be actual evidence that somebody, you know, will not work with the police department. It will impact the relationships. But I want to talk about the community group for a second, because this is our heckler veto. This is a classic example of sort of having to prove a negative. What you're suggesting is that the department has to prove that there were individuals who would not come forward because they were no longer felt they could trust the police to deal with them fairly and partially. They would have to show that there were individuals who did not seek emergency help because they no longer trusted the police. The department would have to prove that there were people who would not come forward to help pursue an investigation. That strikes me respectfully as a highly unrealistic demand for proof in a situation like this. And yet you seem to be embracing that when you talk about it's got to be concrete and particular. That's what you're looking for, aren't you? I'm not saying that. That's the U.S. Supreme Court saying that needs to be far greater than mere speculation. And that's because on the opposite side is the very highest interest into the First Amendment. I understand why this is speculation. So you have one, somebody has come forward to say, I am concerned about this. You have a police chief and other high-level people in the operation who understand their community. They understand the impact of this word on the people that they serve. And Connick tells us you don't have to wait for the problem to unfold. So using reason judgment, they predict for a reason not having to do with the political aspect of the speech, but the use of the pejorative word that there's a problem here and we're going to act on it. It seems to do what you want seems to conflict with what Connick is telling us, that you don't have to wait for the problem to happen. You're saying you need the problem to happen. That doesn't seem to be the law. Not at all, Your Honor. You can have reasonable predictions of disruption, but Connick itself says that the more the speech is on matters of public concern, the more of a showing of disruption you need. Here, all that we have are three community members, one of whom did the talking and said, I have a problem with this. This would create a heckler's veto. You aggregate the public concern from the reasoning of the police. So the reasoning of the police to me here isn't the public concern, which is naming laws after people with certain characteristics. I understand that's a matter of public concern, but the word druggie to me is not a matter of public concern. It's a word that was chosen that suggests to the commissioner that this person will struggle doing their community caretaking function, which has nothing to do with the public concern. Your Honor, druggie is a term used by courts, used in congressional record. In the material facts, it was uncontested that it's a shorthand for drug user or drug abuser. Commissioner disagree with that. Well, the commissioner said that she understood it to mean drug user or drug abuser. It is not an inherently vulgar term. Even were it an inherently vulgar term, causing offense itself is, as Matalvi Tom and that line of cases, Brunetti say, causing offense is itself a viewpoint. So no, heckler's veto cannot be allowed. The government's not empowered to pick winners and losers in the marketplace of idea by empowering certain constituents who complain. Let's go back to the racist float example. You said there was a lot of public media reporting about people being offended. Yes. So you're not saying that's a heckler's veto problem? That's in a very unique context of racial bias. And why is racial bias different? Because police officers are under the 14th Amendment and within their powers need to What other categories of speech would you include in that? So is religious bias? Is that also a problem? I think so. Gender bias, that'd be a problem. Disability bias, would that be a problem? I think disability is farther from that because it's insular and discreet minorities under the 14th Amendment. So if they made vulgar comments about disabled people in the community, you could not remove them for that based on a reasonable prediction? We're saying vulgar comments. I need to emphatically say I don't think that. I understand that you don't think the druggie is. I'm just trying to understand. It sounds to me like you're suggesting even if it were, if it's not about racial bias, you could not make the same kind of reasonable prediction that you concede you could make with respect to a statement that was derogatory on racial lines. I mean, I think the only time that derogatoryness of a comment comes into play is on the disruption prong and when it's manifest that that would cause disruption. And you think that's true when it's a derogatory term that's along racial lines? Only when it's absolutely manifest from the speech itself that it would cause disruption that enhances the predictions of disruption. But I mean, I think it's really essential to understand that if we empower three community members to serve as, and that's all we have, that is all we have here, three community members. If we empower them to serve as the basis for disruption, then an employer just gets to pick and choose winners and losers. Just to make it concrete, suppose this was a racialized derogatory term about George Floyd rather than druggie. Do you think the case comes out the same way or are you saying now they could fire him for that? I think it's a much different case.  Well, again, I want to note everybody has said that's not the case here. That's not what they're concerned of. So yeah, that's off the table in this case. But I think that would implicate potentially the actual ability to perform functions and do so. And why? Why do you think that? Because it's a racially discriminatory comment shows an inability to equally perform functions. So depending on the nature of the bias that is expressed, if it's racial, you would say there is no need for concrete, particularized, articulable proof that the interactions with the community have been impaired. No, there is always need for concrete proof. What's different about the racial bias? You were suggesting there was something inherent in the expression of racial bias that would support disciplining an officer who expressed such bias on the basis of a reasonable prediction that that would impair the police functions of the department. I thought that's what you were saying. I'm saying that would be allowed to be considered under the disruption prong. You still always have to go back to the actual balancing. It's not enough to check a box and say there's some disruption. You need to weigh the disruption against the First Amendment interest.  So let's weigh it then. Just on the racial, it's helpful for me to understand where you're coming from. So now if I'm understanding, it is a public concern, but you can make a reasonable prediction of disruption, and then you still have to go to the weighing. But in our case, you're saying there's not even a basis for getting to the weighing because there's no reasonable disruption at all, correct? Right. Okay. What is different about this case from the case of a racial bias case with respect to why you say without any concrete evidence, you can make a reasonable prediction of disruption based on the racial bias statement, but not on a statement about something like drug dependency? Concrete evidence is always needed, even in the racial context. I'm just honestly lost by what you're saying. Your Honor, here what we have is opposition to the political message of the speech. That's a conclusion we're trying to figure out. The testimony from the commissioner was that he opposed it because of the disruptive impact. He didn't care about the meeting. The finding of the investigator, you're saying we have to reach this conclusion. That's fine, but we're trying to figure out, do you have an answer as to what would support a reasonable prediction of disruption? You seem to say with respect to a statement involving racial bias, no more was needed than a reading of the statement and a recognition of the realities of society. Is that wrong? That's wrong. What I'm saying is with a racial statement, you still need to assess the potential for disruption, how disruptive it might be, who might be offended, but at least lend some support from just the content of the statement itself if it's manifestly racist, the N-word, for example. This is a really, really discreet category of cases that would fall into that gap. In the grand scheme of things, the vast, vast majority of cases, you have to look at the actual evidence of disruption. And again, here, just- Counsel, can I ask you a question? It's just another hypothetical. I just want to see what your reaction to it is. So an officer posts publicly a statement to the following effect. I believe that the vast majority of domestic violence victims or alleged domestic violence victims who have come forward to our department in my 12 years on the department were lying. And I think that most of my colleagues agree. What would be needed beyond supervisors' assessment that that's going to cause a disruption in our ability to work with and treat and handle domestic violence victims? It would need to be a showing that that statement was seen by the community or would have some impact? Assume it was seen. Well, and that's a big one here, right? But assume it was seen, assume it was widely reported, that would be part of the disruption. I mean, it's difficult sort of in the abstract to talk about these cases because you really do have to look at- I'm not talking about in the abstract. I'm just giving you a hypothetical and add whatever facts you need in order to answer the question. Right. Then if it's, you know, widespreadly publicized and there's, you know, groups coming out saying, you know, this makes me not want to work with the police- What if there aren't? I'm before that point. I think it depends on was there any internal reaction, right? But even if there was no reaction, all that happened is Mayor Reeves, who happened to work in his hypothetical example, showed up and said, I'm as troubled by this as I was by that other post. And I think it's not actionable. And here's why. I mean, Pickering and its entire line of cases said, we need to hear from government employees who have specialized knowledge in their respective fields. And we want their opinions in the public debate. I mean, we are dealing with the First Amendment here, right? This is the crux of our political life in this nation. And so it should require a high showing to be able to discipline. We have a precedent. There are many precedents from other circuits saying that law enforcement is a different kind of government function. It's unique because of the authority that law enforcement officials have, the things that they have to do to carry out their responsibilities. Because they are unique, the officials of the department deserve some deference when they make the kind of judgment we have here that they have seen conduct by their employees that may disrupt their ability to perform the kind of core functions that I have described. What happens to that well-established principle of deference if we adopt this very demanding standard of particularized, concrete, articulable proof? How do you reconcile that demand with that well-established principle of deference? We are first, the demanding standard is required by U.S. Supreme Court case law. So I'm not here creating it. It comes from the case law. Second, police departments are subject to the Pickering analysis. We don't take them out of the Pickering analysis just because they're police departments. Third, there's not just some sort of generalized, okay, the employer wins because this is a police department. That would take police departments out of the Pickering test and would mean that police departments don't have First Amendment rights. You reject the proposition that somebody like Commissioner Bard who, learning of this post, meeting with the individuals he met with, concluded that this was sufficiently problematic as to how it would affect the ability of the department to perform its core functions. We need some discipline. He's not entitled to any deference. He is only entitled to deference when it's reasonable. He conducted no investigation. So Waters' ab initio says it's not reasonable. But even if he had conducted an investigation, he would need to shore up evidence. What do you mean he did not conduct an investigation? There was an investigation here. No, Your Honor. There is a report written by the PSU after talking with Officer Hussey once. That's it. There is no investigation. The department still doesn't even know who screenshotted the post. The department, at bottom, needs to say how it would be disruptive. It's not on vibes, right? You don't just say, oh, it could implicate public trust. Well, how? How would that impact the department's operations? You mentioned that the investigation wasn't sufficient. Now you're mentioning, oh, we don't know who screenshotted the post. This is not a decision that the commissioner has to make beyond a reasonable doubt. This is not a criminal case. He's got to act on the spot. He's going to make decisions. Some may like him. Some may not. But are you suggesting that he's got to do like a full-fledged FBI investigation? Your Honor, Waters says that the investigation needs to be reasonable under a third-party standard of what a reasonable manager would need to understand the disruptive potential of the speech. They have just said that it's- There's no doubt he's got that screenshot, and there's no doubt that Hussie was the one who wrote that, right? Yes, no doubt. That's not sufficient for him to make a determination at that spot? Well, of course not, because we don't know how it would impact the department's operations. Would there be a single person that- Let me go in kind of what Judge Rickleman was saying, the external disruption. We have to look at the trust in the community. We have to be more specific than that. I mean, the generalized trust- Let me say this. I presided over a consent decree case for over a decade, police reform, USDOJ, so in the state. And one of the things it takes, that I know of, it takes years to build that community trust. It can take seconds to do away with that community trust. Isn't that something the commissioner can take into consideration? That's going to disrupt the- Or are we supposed to sit as super commissioners on top of him and second-guess what he's making as an on-the-spot decision after investigating what he investigated? No, this court needs to review the record and identify, is there evidence for the proposition that this would be disruptive? But what it can't consider are these three people coming and saying, I disagree with the speech. I mean, that makes mincemeat of Pickard. There's more than that. The district court emphasized the context, the context being the murder of George Floyd in May. We're now into February, and there has continued to be, in this country, unprecedented expressions of concern about the way in which police departments carry out their function, the relationship between police departments and the community. There were protests in Cambridge in the wake of the George Floyd murder. In fact, on March 6th, just before the events we're talking about, the trial of Derek Chauvin was about to begin. There were protests again in Boston with that trial pending. I mean, is that not a critical context which gives some immediacy to the concern of the comment about George Floyd could complicate their ability to carry out their core functions? Isn't that critical context which the cases say the courts are supposed to look at in deciding about the reasonableness of the prediction of disruption? Isn't that critical context? Yes, but not in the way that you're saying, Your Honor. It's critical context to advance his First Amendment interests. The fact that there is ongoing political discourse of an important nature, and by the way, this post was nine months after the murder of George Floyd. It was not the week of or the month of. You don't shut down all political discussion because there's a lot of political discussion. That's when we need more voices. Justice Brandeis' famous quote of men feared witches and burned women, it's the function of speech to free men from the bondage of irrational fears. Counsel, let me ask you another hypothetical. I'm just trying to think this through. I understand your arguments that community disapproval is not enough to squash speech, but the way that the speech is expressed, I understand you to agree, can be considered in the disruption part of the analysis. So here's my hypothetical for you. What if, and it doesn't need to be your client, but a police officer makes posts on a monthly basis on Facebook. They only stay up for two hours. But each of the posts contains language that a part of the Cambridge community would use disrespectful. You may think druggie is a neutral word. The commissioner thought it would be disrespectful to portions of the community. So say there's a series of posts. They're only up for a bit of time. Sometimes they're disrespectful to people who are reporting domestic violence, for instance, in Judge Howard's example, sometimes they use words like druggie, whatever it may be, but they go up over a series of time. There's one a month for six or eight months. Would that change how we should do the analysis in your view in terms of whether or not a prediction of disruption is reasonable? So obviously not our case. And that's why it's a hypothetical fully understand. And there are a lot of open questions on that of what are the posts say? Are they touching on poor political speech? You know, who's viewing them? Are they disruptive? So it really is a fact context specific analysis. But I take your point that if it's offending people in the community, isn't it actionable? And the frank answer is if it's offending them because of its political viewpoints, then it's not actionable. I could give you a few. It's not about whether it's that again, I understand your First Amendment arguments and, you know, derogatory speech gets full protection, but we're now in the disruption analysis. I'm asking you to try and focus very much on what a commissioner's decision that disruption is likely and loss of trust with community members who this police officer is bound to protect and serve is going to undercut that officer's ability to do their job. Does the number of posts in your view affect the analysis that we should do whether a prediction of disruption would be reasonable? Sure, it certainly could if it's, you know, frequent. But again, your honors positing people are offended by the content. What I'm saying is, if it's the political content that they're offended by, that cannot be cognizable as a disruption. But if they're offended by the derogatory statement of their nature, is that something that's permissible? No, it's in the racist folk case. Just to go back to that. That's what I was about to say. It's only that insular. Why would that be as a legal matter? I understand what the doctrine says. But again, we're in the disruption part of it. So in other words, a police officer is serving their entire community, as I'm sure your client understands very well. So if that officer is regularly engaging in speech on a Facebook post, Facebook page to about 600 people and saying things that are derogatory about different segments of the community, why isn't it reasonable for a commissioner to predict that that's going to cause a loss of public trust? I'm just trying to help you. I'm trying to get you to help us understand, you know, we're in the disruption part of the analysis now. We don't need to figure out if it's a protected class under the 14th Amendment. We're just trying to figure out, is it going to sow discord with the community members that they're supposed to be protected? So how do we do the reasonableness of that prediction? Don't worry if it's a protected class or get strict scrutiny normally. Well, that is the only reason I can put Chief Judge Barron's, you know, racial questions to the side, because otherwise, offense at political statements is not at all. You're saying that that would survive strict scrutiny is the idea? You're saying the racial post? That's what you're saying. You're saying it flunks pickering, but then somehow it survives strict scrutiny or something like that? It could potentially, but it's also not. It could. I mean, what are you saying to us? Yeah, I mean, yes, essentially. Yes, it would fail under the government's regulation could survive under strict scrutiny in that context. And that's based on the Garcetti line of you must face only those only the consequences necessary to prevent disruption. But the point and I want to address Judge Rickleman's question because this is just I'm sorry, but last before you get back to that, but with respect to disability. No, I don't think that's a discreet and insular class in the same way that for others would be. But it's an open question that, frankly, I think could be cited down the line because that's not the case here. But why isn't addiction a disability? I think we need to distinguish from what he said and what the commissioner says he said. What's the matter of public concern in your mind in this case? It's the enactment of section one of the police reform bill, which says it shall be named after George Floyd. And so the commissioner doesn't take issue with that, or at least that's how I read the commissioner. He said, I take issue with the way you describe the problem to use a word that has a community impact. And what I'm focused on is not the political, not the matter of public concern, the word that has a downstream effect on our community because we have people with substance abuse disorder in that word will have a problem for my community. So can those be disaggregated? I'm not concerned with you challenging how they named section one of the police reform act. I'm challenging that word because just like the the all the other classes, we have that class and they are going to be hurt by that. So two points here. One, we know that's not the motivation of the police commissioner because he was shown a post by the deputy superintendent in Somerville that said we shouldn't name the police bill after Mr. Floyd because he has a lengthy criminal record. Didn't mention druggy, drug use, anything about drugs, didn't have any derogatory terms and he was asked his deposition. Would that have been a problem? And he said, yes, that still would have been a problem. I still would have taken disciplinary action. So we know it's not actually about the term drug. Was there an issue in this case about the real motivation of the commissioner? Yeah. So I mean, this court needs to decide, you know, if just based on their proffered disruption interest and what we know the speech is, does it fail the Pickering test? But when you began the argument, I think you said we know the police commissioner personally disagreed with the statement. Are you basing that on that segment from the in part? He also made that argument to the district court. We did. Yes, the district court. Does the district court address that point in her opinion? She says that there's not, you know, there's scant evidence to suggest that the commissioner was motivated by anything other than, you know, this, this trust. Your opposition to the motion for summary judgment. One of the reasons you said this couldn't have been the basis was because of how he responded to the Somerville posting into a number of posts. But yeah, there were no district court did deal with your motivation argument and rejected them. And in the now vacated decision, we address that as well and said you had not generated any issue material fact on the motivation issue. So it's not like the district court neglected that issue or that we neglected it. It was raised and rejected below and above. Well, with great respect to your honor, the panel and the district court both got this plainly wrong based on the record. There's, you know, the, the other instance, in addition to what I just mentioned, was that commissioner Elo and another officer in central square used the term crackhead to describe individuals. One officer talking to another. That was the point beyond that. That's not entirely accurate. That was really, how does this work? I guess is what I want to understand. If I were to think that using druggy as is a pejorative word that's disruptive. And if the commissioner truly believed that he could discipline, but you're suggesting there's evidence that he didn't believe that that was made up or pretext. What happens is that part of this Pickering analysis that we resolve DeNovo is that amount healthy trial? What is that? We think on the Pickering basis alone, just based on their descriptions of what they say, the disruption is, and based on what we all agree or undisputed, what I said is it is.  So I think that if he, the commissioner truly believed that then Pickering comes out in favor of the city, but you say there's a motivation issue. Maybe that's not what the commissioner actually believed. Yeah. Water I get litigated. The water says that a good faith belief is necessary, but not sufficient. It literally says that. So we know that, but here's the problem. Your honor, this is the answer. Judge a frames question. I don't know if you're grasping his question. The question he's asking you is assume that the conclusion of this court would be that if the city of Cambridge believed that the statement would be disrupted, the statement would be disruptive because of a reasonable prediction of this court were to conclude that is correct. That would be a reasonable prediction. You'd win under comic. Assume all of that is what this court would rule. He's asking you, are you making a distinct argument that even if that's true, you still have to decide? Is that what he believed as a factual matter? Exactly. Yes. Okay. You are making that argument and throughout, and I'm now asking one of his follow-up question is in resolving that question, you're saying that's a purely factual question, not reviewed de novo. Well, they're factual disputes. So that's why I would need to be remanded. Okay. And who has the burden in determining what the true motive was in an instance in which all of the overt statements by the city or that they were not relying on opposition to the content or the overt statements are the reason we did this is because of the disruption. Who has the burden of showing that those statements should not be believed. Instead, the inference should be made circumstantially that he's not really basing it on what he said he's basing it on. So we're on summary judgment here. So it's their burden, not only to say that that's our belief, that it's their burden to show that there's the ultimate burden, because it may bear on whether we think there's enough evidence for there to be a factual dispute. Who has the ultimate burden on proving that despite what he said was the reason, the real reason should inferentially be determined to be opposite of that. It's doubly their burden on summary judgment. They must prove that there's no possibility that it's pretextual and they have to prove under the Pickering framework, the disruption. And the proof of pretext, you don't, it's not burden on you to show pretext? Well, because we've already put that materially in dispute by showing all of these other instances in which speech was not disciplined. And so I think that's really crucial. But, but, okay. And the last point on this, put aside those other instances for a second. One of the instances that you put forward to the district court for proving pretext was that when shown a equivalent statement that did not include the term druggie, the commissioner said, I would also discipline him for that. I believe so. I will be sure to check on, you know, and come back with rebuttal. But I believe we argued all of these instances and often did a general, in a general way. And then also went through and set the record. But just so we're clear on this, there was an instance where you said there was a comparable comment made by another officer that resulted in no discipline. The district court found out that's not true. An officer was suspended for five days. That's one of about four instances that we've mentioned. There's a crackhead remark. There's the post by the, you know, Cambridge, by the Somerville deputy, there's the union's post, and there's the one that you're referring to. And the one that you're referring to, the only evidence in the record, the commissioner testified he was suspended for five days. But I don't remember if he ever served the suspension, of course, it being summary judgment entitled to infer that he didn't. But, but irrespective of all this, I think this is really the crux of this case, which is, you know, I can give a hundred hypos of, you know, if a teacher posts, Israel is committing a genocide and those who support Israel are complicit, right? And a local Jewish advocacy group complains that the post is anti-Semitic and they're concerned about bias against police, against Jewish, you know, or Israeli constituents. That's all that the commissioner needs to bat it down. But the reverse is true on the other side. If, if they post Palestine is harboring terrorists and those who support them are enabling it. Use the pejorative word about Jews in the, in the state. That's the problem. So your honor, then I think we need to address whether druggie is pejorative. Why don't we close on that and then you have three minutes to rebuttal. Sure, your honor. Druggie is, is used by courts, by congressional testimony, in dictionaries, in New York Times articles, in ways that are not critical of people using drugs. And we've cited them in very lengthy. Officer Hussey himself in his testimony said that was an unprofessional choice of words and he would never use it in addressing an individual. Isn't that correct? No, your honor. He said it would be unprofessional to use it to somebody on the street while performing the functions of a police officer. And I think that's true. Respect an analogy might be if I were to hear refer to you with great respect, your honor, as Kermit, that would be inappropriate and unprofessional. But if I were to go home and post my Facebook page, got some really tough questions today from Kermit Lopez, that would not be unprofessional. And so the context obviously matters. He certainly has never said it was unprofessional in the way he used it in that Facebook page post. But, but, but Tommy, Tom, and let me ask you, yes or no, you, you, is your position or let me make the proposition. Shouldn't law enforcement officials like officer Hussey be held to a higher standard similar to us judges? There's a lot of things that we take the position. We can't make a lot of public statements whether we like it or not. And we have to be very careful. And even in our own private social media, if it becomes public, it could, you know, isn't that analogous to perhaps how officers should be held? Yes or no? It can be considered. Yes. But it, that would open, blow open a hole because I think most parents would agree that teachers need to occupy a really trusted position when they have their children in local. Police officers forget, you know, the case about teachers may come another day, but police officers. I agree again, your honor. But the, what I, what the point I'm trying to make is you could say this about virtually the majority of public employees. I mean, social workers who are providing therapy or firefighters or bus drivers who are essentially driving a missile filled with people. Of course, they need to have confidence. They're not going to drive off a bridge or something that, that would be such an expansive gap. And I think the seventh circuit case, which says Garrity says, you don't, police officers don't trade in a badge for their free speech rights. That's the exact doctrine from McAuliffey New Bedford that the Supreme Court overturned in Pickering. And so if we were to say that police officers are taken out of the Pickering framework, or if it's an auto win for their employer, which this court would have to say, based on the evidence here, that it's an auto win. And the only reason is police officers or the general, you know, discordance and political discussion going on while the legislative clock is running on this provision. The officer has, he's opposing. He has to stay silent until they enact the legislation. I think that would be really, really precarious.  Thank you. Thank you, counsel. At this time, would counsel to the appellee, please introduce himself on the record to begin. May it please the court, Robert Loeb for the city of Cambridge. Loeb, could you raise your microphone? Thank you. A little better. Robert Loeb for the city of Cambridge at all the defendants appellee in this matter. So as the questions here noted, the standard at this stage is whether there is a reasonable prediction of disruption, or in the words of Garcetti, of concern that there's going to be impaired, effective and efficient delivery of service. So in looking at that question, this court's precedents and the Supreme Court precedents require you to look at the specific context, the time, place and manner of what was going on, the policies of the particular place, and what was the concern. And here in the summary judgment record, it shows there's two key contextual realities at the time. One was that at this time when Officer Hussey makes his post calling George Floyd a druggie, the police department had just spent years building the trust with the community, especially in regard to its rehabilitative approach to people who have substance use issues in their families. And Commissioner Bard's deposition, his sworn testimony on this is very clear and goes in detail, that for these programs to work, which they're dedicated to in the city of Cambridge, you need to have the trust of the individual substance abuse user, and you need to have the trust of their families. If you look at page 324 of the Joint Appendix, the deposition 48, it talks about how for this to work, you need the individual who has the substance use problems to be able to submit themselves and trust the police officers. You need their families to trust the police officers to refer their children, their relatives for help. What you're suggesting is that Officer Hussey, they serve to protect the public, but that public not only includes everyday normal citizens who have no issues, but also people, and I use the term, even assuming people who use drugs or individuals who have prior criminal records, but police officers still serve them. They have to intervene sometimes, they may have to arrest them, but they still have to have that credibility, that trust, even in those individuals when they have to intervene. Am I correct? Absolutely, Your Honor. The Supreme Court Waters case, which he repeatedly cited, says there's no First Amendment problem for the government to discipline an employee for being rude to its customers, and here for any of the Cambridge Police Department, who are the customers? It's the citizens, it's the residents of the city of Cambridge, which also includes those who have, people who have substance use issues and their families. You have these programs which have been set up, which they've spent years and years developing this trust between them. What are the dimensions of limitation on this idea? So I take it the word druggie, you're saying, is in and of itself sufficiently derogatory that it threatens that trust, but obviously there's questions that arise as to does that mean the officer can't write that word in his diary? Does that mean the officer can't say it to his wife? Does that mean the officer can't send it as an email to a friend? Where do we draw that line in your view as to when the reasonable prediction of disruption owing to the use of that word becomes reasonable? Well, in Rankin, they tried to distinguish the situation between just a pure private conversation, and like they point out a conversation that took place on the square between two individuals who used the word crackhead where no one else heard it. That is not the same thing as when you put something on Facebook, when you have six or 700 friends who then can share it. What's the line? I understand it's not the same thing. It is, in fact, not the same thing. But what is the legal test you would want us to deploy in deciding when the use of a derogatory term that I take it you're saying is inherent in it supports a reasonable prediction if what? There's a sufficient likelihood that the community would know about it at all. There's a sufficient likelihood that many community members would know about it. What's the? Really, everything is contextual. You're dealing with a small community. You're dealing with a Facebook post that went to hundreds of other police officers. And in that context where it's a small community and where it's obvious within days this has already been shared with members of the community, Commissioner Bard made a reasonable judgment that it was something that has now been out there and which now threatened to create irreparable harm, irreparable risk. And I guess it's on that last point. Is irreparable harm because of – I mean, just what's the logic train that's leading to that? It's the idea that it'll just become widespread knowledge in the community or by a sufficiently large amount of the community that that'll be attributed to the department. Is that the idea? As the – Or is it like one member of the community might think that and that's enough? In other words, how are we supposed to think about and try to assess the reasonable prediction? So the police department report said this post shows disrespect for people who have substance use issues but also suggested that there was also bias and disrespect within the entire police department. You're dealing with a veteran officer. As he said, he served for more than 20 years. He worked often with people with drug issues. Or is that important that it be reasonable to predict that the statement by the one officer would be attributed to the department as a whole? That's an important factor also that he – And what supports that prediction here? The prediction is that he is – this is a message that's been seen by hundreds of others on his Facebook that – and he's normalizing treating this class of people with disrespect. So in this context – Could I probe a little bit further as to the standard you'd have us apply on this point? So I understand that you're now conceding that you can't subject speech to a vulgarity penalty. So this is on the disruption prong only. What standard are you asking us to apply kind of in that part of the analysis? Is it the mocking, derogatory, disparaging test? Is it vulgar, insulting, defiant? Which of those two would you say we should apply? I wouldn't say it's either, Your Honor. This is a contextual – you're examining as to whether there's a reasonable prediction here by the commissioner of having impaired services in a context where – Let me ask you just a little bit more then. What is a judicially administrable standard for mocking, disparaging, derogatory that we could apply? I don't think there should be a general rule. It has to be – in many cases, it'll be completely irrelevant. Is that troubling that there's no standard for determining what is mocking, what is derogatory? Very much in the eye of the beholder, which I think is a problem under the – We're trying to avoid that by actually looking at the particular community and actual reasonable predictions of impacts on that particular community. It could be that because Cambridge has this program for focusing on rehabilitation and spent years building the trust, that here using that word where – as in the words of Commissioner Bard, it rips at that trust. That may not be the case in another city where that language may be more normalized or where they don't have a focus on rehabilitation, don't have a focus on that connection and trust with the community. Do we have to defer to the superintendent's determination on that? Waters tells the courts there's a substantial weight to his reasonable prediction based on his knowledge. They say there's no evidence here. His sworn testimony is evidence. He is speaking based on his knowledge of the Cambridge community, his knowledge of the family. The cases are full of the word speculative that the – in order to be a reasonable prediction of disruption, the proof underlying that prediction cannot be unduly speculative. What spares the prediction of Commissioner Bard of that description that his prediction based on this post, the conversations he had with the NAACP officials, the community organizer, and other individuals, what again spares him from that characterization of this prediction that is unduly speculative? Waters recognizes that when you have this type of prediction of disruption, prediction of adverse effects on the government services, it's often going to be speculative and it can be called speculative. That doesn't make – you said unduly. The question is, is it reasonable based on the knowledge and experience? Waters talks about you can even do it based on your knowledge and experience with that employee that you know that this person has a problem with their respecting the community or their problem. Here, it was based on the Commissioner's own experience, years of experience in building this program for rehabilitation for people with drug issues, knowing how sensitive to the relations are, and knowing that the word druggie, especially with that community, is going to send a message of disrespect. Is it your position that the city's prediction of disruption only relies on the use of the word druggie or does it also rely on the other words? I think it's safe to say primarily, maybe not entirely, but primarily relies on the fact that it's showing bias, showing a lack of respect for people who have drug and substance use issues. I don't think the aspect of it about criminal background, it's there and it's also rude to people with criminal backgrounds, but the discussion of the harm from Commissioner Bard is almost entirely about on the substance issues. So you said earlier that the status of the police officer as a veteran making this comment to a number of other police officers and frankly hundreds of people on his private Facebook who had access to his private Facebook account could be construed as by the public, whatever the public means, as department's position. Would that be the same with a school teacher who posts something that's now the school's position, that's a reasonable, something that was up for a couple of hours, it's reasonable to predict that the public or even a particular segment of the public is now going to think that that's the department's position given the years and years spent building this trust? Yeah, I think in this case, it may not be in your average case, but in this case where he is on the force for more than 20 years, has spent more than a decade working on drug offenses for someone like him, just a flippantly called someone who's a substance user, a druggy, sends a message of disrespect to those people and to their families. If you're observing that it would be viewed as the position of the department, I just want to know if you're standing by that statement that you made. The decision just says a person could interpret it as that because here you have an experienced veteran person who has a view, it might reflect poorly on the department as a whole and I for the commissioner to want to send a message here to Officer Hussey that this type of disrespectful language is not acceptable to his colleagues, including the hundreds who saw it on Facebook. Did the department ever issue any sort of a press release or anything disavowing these comments? There's not any record- I'm just asking you if they did. All of the reprimands are online, so all that is available in public and I'm sure it's been I don't think there was a- I don't have a knowledge of a press release. No public apology or on the media, the commissioner go on the media and say, this is not representative of our police force. It's not in the record, correct? They have available online, you can see that he was reprimanded for this conduct. I don't think there's anything separate in the record on that. Let me also ask you, let's assume Hussey, instead of using the language he used, he said, I, this is an individual referring to George Floyd who had trouble with the law in the past and has used drugs in the past. Would the commissioner still be able to suspend him and take the same action using that more- The commissioner said in his deposition, if he had used language like that, we wouldn't be here today, that he wouldn't have taken any action to suspend him and they wouldn't have, there wouldn't be this lawsuit. How do you, just going back to Judge Dunlap's question about the standard for derogatory, you seem to be answering Judge Helpe's question, applying some derogatory test implicitly, that stating the fact that he used drugs would not be itself derogatory, but calling someone a drug he is, and that there's some way in which judges assessing that could characterize the first as falling within the bucket derogatory, that then supports the reasonable prediction on the face of the statement because of what we think people react to statements that are derogatory of them. But I'm taking it, you wouldn't say that we just have to take it at face value whenever the commissioner says this was derogatory, or are you saying we would absolutely have to defer any characterization? No, I think you're looking at Commissioner Bard's lengthy explanation of why in this context, using that kind of language was destructive. That's not my question. I'm asking a threshold question. Judge Dunlap was curious if your disruption analysis is predicated in part on the terminology being derogatory, which very logical reason to do that. I took his question to be, but how would we apply a derogatory standard? By what metric would we assess whether a statement was or not derogatory? Now, I assume your view is we defer somewhat to that characterization by the chief, but we also wouldn't, I take it, advocate and just take whatever they said. So what's the test we're going to be using? Is there an answer to that? A reasoned basis for why the use of that language is going to have particular, raise particular concerns and particular risks. That's a question about whether the use of any word would be disruptive. I took your argument to be that certain words, because they are derogatory, more naturally yield otherwise unsupported predictions about how the community responds to them, which is a quite natural thing. If I get up and say, the people in this crowd, the one sitting over there, and I say a bunch of really mean things about them, that might undermine trust. If I say, welcome, great to have you here, that won't undermine trust in them. And the thought would be because the first statement is derogatory of them. Judge Dunlap's question is, how are courts supposed to apply that standard? Do you have an answer for him? I think you can still be as, have the negative consequence without using a derogatory, inherently derogatory word. Here, using a druggie itself was a offhanded way, which suggests, which the commissioner and his expert, and he gets substantial deference, knowing this community, that they're going to view this as a showing of lack of respect, a lack of, it's a dehumanizing word in his terms, and that's how it'll be perceived. And what makes that reasonable to characterize it that way? Is there some criterion we could apply that would enable us to say, just look it up in the dictionary, what the word derogatory means, and it fits that? I mean, that might be reasonable. Or is it, that it has an immutable quality to it? When I say you use drugs, that's something. When I call you a druggie, I am assigning to you something that is of your character, which brings it in line with all of the other examples Judge Barron gave earlier. And the commissioner's testimony is like, he said, when you call someone a druggie, you're, do you mean, I think, make it easier to treat them with lack of respect, it's easier to abuse them in those circumstances. To the extent that there's any question as to Officer Hussey was using the word druggie in a derogatory manner, I mean, the surrounding words kind of answer that. He didn't just call him a druggie, right? He called him a thief, a professional criminal. I mean, there was just a series of very harsh words about him. So he certainly wasn't using druggie in some neutral, descriptive fashion. Disrespect for, and this is what Commissioner Bard said, it's showing disrespect for both and more generally, people who are substance users and their families. Counsel, I want to make sure I understand what your argument is about why the prediction here was reasonable, what evidence you're relying on in the record, because you haven't actually mentioned so far in your argument, the meeting with the NAACP. I think what you've focused on so far are the words of the Facebook posts themselves, and then the Commissioner's testimony about what he thought the response from people in the community would be given his experience and what the police department had been working on. So those are two things in the record that I've heard you mention. Is there anything else in the record that you think we need to consider in deciding whether his prediction was reasonable? As to the community members who brought this to his attention, I think the only relevance is that obviously this message had gotten out and been spread around. It was now presented to the Commissioner as something that was being spread through the community. So that's really the only relevance of that. It wasn't done to appease anyone. It wasn't done because of the political message. It was done because on its base, the Commissioner saw that this was, as Judge Sleipman... That's what I just want to clarify. It's just those two points in the record that you think we should be looking at to analyze whether the prediction was reasonable? I think that's the primary evidence in this case. Okay. Let me just... Just to make sure the answer's to Judge Ruppelman, I got it. Were you saying that we could rely on it for purposes of determining whether the message got out to the public? Yes. I mean, the meeting with the NAACP. Yes. People had shared it with them from their community members, people... And is that relevant to assessing the reasonableness of his prediction? Well, the reasonable prediction is that it's not... He knows that it's been... It's out in the community generally. And so it informs that to that respect. And then can I just clarify, excuse me, Judge Dunlap, how you think the test works? Because... And you tell me if you disagree. My understanding is we look at the evidence to see if the prediction is reasonable. And only if we conclude the prediction is reasonable would we then defer to the commissioner's judgment. Do you agree with that? Or do you have a different view of the way the test operates? Well, Waters explains there can be numerous reasonable reactions to words or language chosen. No, I understand. I'm sorry. Maybe my question isn't clear. In terms of the deference that we give to the person making the decision about the disruption, the way I understand the and please tell me if you disagree, is that we first determine if the prediction is reasonable based on the evidence. Could it be a reasonable prediction? And I understand there could be multiple reasonable predictions, but we would only defer to the prediction if we conclude it fell within the range of reasonableness. That's your honor. Okay. Thank you. Be careful. I mean, I thought, frankly, you were going to say that in making that reasonableness determination about what the commissioner predicted, that the deference that is to be accorded to a police commissioner informs, at least in part, the reasonableness of that determination. There's a huge difference between that and the way you answered Judge Riggleman's question. I agree with that. I misspoke. So it talks about the reasonableness of the prediction and the court needs to provide substantial deference to it. And obviously, this court, nor I, are experts of the way that Commissioner Bard is regarding the community in the city and about dealing with the rehabilitation program, dealing with the people with substance issues, and dealing with their families and those sensitivities. So those are kind of things that you really can't seriously second guess, as long as he's making a reasonable argument that it makes rational sense that this is out there. And I think you also need to lens back to a broader point, that he has a duty, really, to protect the trust that the local community has, including that people, substance users, with the police department. If you had a law clerk who on social media posted about a class of litigants, say immigrants, and said in their post, well, those are undeserving people who have spent way too much of our time on it. It's not of our time or our sympathy, in my view. You would think the employing judge, without having statistical proof of disruption, could reprimand that clerk, and he'd be rightfully concerned that they would undermine the public's confidence in the judiciary being impartial and being trustworthy. And similarly here, Commissioner... Your point is what I asked opposing counsel. Police officers should be held to perhaps a higher standard than your average other public employees, kind of similar to judges. Yeah, as the language in water says, just being rude to your customers is a legitimate ground for the government as an employer to take action. And here, doing the four-day unpaid suspension. Locurda, which is about the police and the special nature of the police, points out, he says, the First Amendment doesn't require the employer to sit idly by while its employees, the police officers, insult those they are hired to serve and to protect. And that's the situation here. By using that type of language, he is showing a lack of trust, a lack of respect for a segment of that community, and it's reasonable for the commissioner... Let me go back to something that Judge Howard asked about the lack of a public statement from the department following the comments. Does that bear on the reasonableness of the department's prediction of disruption if they didn't feel that it was necessary for a sustained length of time to not say anything about it? The first part, they were investigating and they're not going to say anything first other than that they're investigating. And afterwards... They could make a statement not specific as to the officer, but they could make a statement as to the department's position, right? Yeah. Again, this goes to the, there could be many different reasonable ways you can approach the discipline here and actions here. And one could be to have a statement. You can also take the view that having a statement, a big public statement, and one of our officers from 20 years said that George Floyd is a drug use, they're just compounding the problem. They were... This goes more to multiple choices as to how to deal with this situation, but it goes to the reasonableness of their prediction. If they didn't feel that it was necessary to do anything, and they could come up with a statement much less direct than that, they could make a statement as to how they treat the people that they come across. But they didn't feel that it was necessary to say anything for a sustained period of time, which suggests that perhaps there was no risk of actual disruption. There was also a union grievance at the time. There's lots of issues. You may not want to make public statements, but again, the discipline is a matter of public record. And those community members who were concerned certainly knew about it, and they would have shared information between each other about the discipline that was issued in the case. Is there anything in the record about why no statement was made? There isn't anything in the record about statements or reason statements were made one way or the other, other than we know it's a matter of law. And you can look up yourself on the internet, all the different... Judge Monaco, do you have a question? I had a quick question. The investigation report and the finding of violations of police policy, does that play at all into the disruption, whether it was a reasonable prediction of disruption? In disruption here, it's not the sense of people protesting or taking the street or demanding Officer Hussey. The disruption is one of undermining the trust. And the police report cites him for one of the rules there, you need to be courteous and respectful to the citizens of the city of Cambridge and found that he had violated that and showed that he had showed specific disrespect for the class of people who have substance issues and their families, et cetera. So he's in violation of that rule. And again, the commissioner has the right and the duty to police his own staff to tell Officer Hussey this kind of language, which is discourteous and which uses dehumanizing language about a class of our citizens is unacceptable. And also by issuing this four-day unpaid suspension, you're also sending a message to the other officers that this is unacceptable behavior. And you're sending a message to... What I'm asking is this, I read the commissioner's deposition testimony and you've cited that a lot and said, read that and you'll find that he made a reasonable prediction. Does that underlying report somehow buttress the commissioner's testimony or is it sort of extraneous? It's a professional standards unit, which is examining whether he violated professional standards. It wasn't intending to make any predictions one way or the other. It's providing information then for the commissioner to assess whether there was a violation and what to do about it. And then he, using his authority as commissioner, did that. Counsel, can I just return to a question that I asked opposing counsel at the beginning? I gather you would agree that there is no evidence in this record of specific instances where individuals citing the post of Officer Hustie said, I no longer trust the department. You've asked me to cooperate in investigation. I'm not going to do it. Or, yeah, I was in a crisis, but I'm not going to get any help from you guys. So I'm not going to reach out to you. There is nothing that would meet the description used by opposing counsel and a number of the amici in their briefs of a concrete, particularized instance of the unwillingness of members of the public to now cooperate with the Cambridge Police Department. And that is just a misstatement of Supreme Court precedent and the law about what's required. You just need a reasonable prediction based on all the context and all the factors. And just look at my example about the law clerk. You don't need to survey the, if he said something negative about immigrants, you don't need to survey immigrants within the First Circuit to see whether they were offended by it and don't trust the court anymore. Can it be different in different places? So, for example, let's take the word illegal. Some people will react to that word as disparaging, some will not. The question in a particular judge might be, well, I have a certain view about that and I'm going to punish that because I have a certain way that I think things should be. And another judge may think something totally different about that. So how much does it matter how much the commissioner explain this is our community, this is our drug program, this is our policy, this is inconsistent with it and suggests a culture potentially in Cambridge police that I don't want to have. And that may be different next door in Medford. Does that, like how much is it is about that? It's very much, very much about that, that it's something that's found to cause a reasonable risk of disruption or adverse effects to government functioning in one place like the city of Cambridge, which has its own unique politics, its own unique community, and its own unique approach to policing. When you say deference, is that like sort of what we're getting at, do you think, in the case law, that once if you have an explanation that attaches the word or the problem to the community or the job, that's what we're supposed to be referring to? You're supposed to give it substantial weight and not just disregard it. It's like, well, he's the expert on this community and on that particular drug rehabilitation program, all the investments of the years, and as he said, we're at risk by this kind of statement. How does that not build in viewpoint discrimination? If it is unpopular or would be derogatory in one community, but it's not in another community, that seems to suggest to me we've got a problem with the application here because, again, it is you're taking a viewpoint and you're punishing or not punishing based on the popularity of that viewpoint in a particular context. There's no viewpoint one way or another. It may be that the word druggie is normalized in some part of the country and it's unreasonable to make predictions about it or you maybe don't have this community rehabilitative approach where you're so concerned about people with drug issues being offended or not. The city of Cambridge is just different. That's not a different viewpoint. This is a different reality, and Pickering itself said it's hard to make hard, fast rules in this context because it's so context-specific as to the time, place, and manner of how each thing was, what is the speech going to be considered a public concern, and is it going to have in the particular area, in the particular city, even in the police, he's someone who's out there public-facing. If it was someone in the back room who was a computer coder who no one knew and he posted something on his Facebook, no one would necessarily attribute that to the police department or the people who are part of this rehabilitation program wouldn't be concerned about it. When you have a prominent, well-known officer like Officer Hussey in this community, that's very different. You can have different rules based on the realities of the situation. It may cause harm in one place and it may not cause harm in another. Pickering, back from 55 years ago, recognized that from its initial statement of this balancing task. I'm just trying to figure out how, since we all agree that it's not a prediction of disapproval, it's a prediction of disruption, how we do the analysis in an objective way to make sure that that's what was reasonably predicted here. In other words, lots of things that people say can be offensive to different people. Different people have subjective views of what makes something offensive. Police officers make Facebook posts and some section of the community finds it offensive. Is that in and of itself enough, that disapproval, to make the prediction of disruption reasonable? How do you think we should do the analysis to make sure that we're objectively distinguishing between disruption and disapproval? Because it's not just mere disapproval. You need to show that there's some here, it's not just disruption, like you're not going to be able to do your job. It's that in order to do our job, we need to have collaboration with a community, a community, a very sensitive community of people who have substance use issues. We aren't used to trusting the police and their families. We need them to bring their people in and to trust one another and to refer each other. It's the context of- What is it about the state? Judge in Waters, they make clear, they say, obviously you could have a rule, no rude comments to customers. Now, that's implying there's something about the manner in which it's said, independent of just the disapproval of any message by the customer. The idea is you can't be rude to them because that's a particular way of treating a customer that we just know from experience could be antithetical to the mission. I took you to be saying the use of the term druggie has that quality. In fact, the application of the rude comments to the public, which they applied, it seems to be consistent with that. Is that a means of distinguishing between disapproval and disruption, which is when the content of the message or the message's manner is expressed in a way that is rude, derogatory, less than respectful, whatever terms we use. Is that like the police department, which is very different, requires interaction, requires trust, requires reporting back and forth, that the customer analogy is very apt, and the second circuit hits on that, that when you insult members of the community, you are impairing your ability to do the job. You're also putting a stain on the police department as a whole. Just on this, go ahead, just let them know. It is the analogy apt because you could have different situations. You could have a comment made in a workplace setting face-to-face to the customer, and the employer could have good reason to find that that would disrupt the provision of services. It might be another context to have a statement on an abstract political event in a location that's not directly tied to the work. I'm not sure that the analogy is quite as apt as you suggested. It doesn't map on directly, but he is making a public post to his fellow police, hundreds of police officers on Facebook, in a form where it can be shared with hundreds more, and certainly it was quickly shared. He did this in a time when the scrutiny between the police and the community was under a microscope. Here he is saying that George Floyd is a druggie and talking about him in demeaning ways. What if, instead of referring to George Floyd, assume somebody by the name of Steve Johnson, who is receiving just a recognition by the city, and Officer Halsey made the same remark? He's a druggie, he's a thief, he's a criminal. Would nobody even remember who is being recognized by the community? I think, given the scrutiny at the time and the microscope, it was a more reasonable prediction for the commissioner that this language at this moment in time was a riskier thing to the trust that was built up with the community, especially the community who were participating in the rehabilitative... Language as to any individual at this particular time would have... Well, he did it in regard to someone who was... And it did, in fact, garner attention. You have to add George Floyd to the mix of druggie, thief, and criminal. There's not a magic formula here. The commissioner is dealing with the cards that were dealt. He put out this post at that time of heightened scrutiny. He used the words druggie and criminal in this disparaging way. The commissioner looking at that and knowing the relations with the community, knowing about the rehabilitative program, saying if it gets... It is spread out there that we take no action against the police officer who's using this kind of language, it could be very devastating to the trust that we have built up for years. Judge Rickleman asked you, how would we draw this line between disapproval and disruption? And one way of focusing on that question is to just focus on the reasonableness of the prediction. But let's assume there's enough evidence here to support a reasonable prediction. There's a separate question whether that's the real reason. And one way of managing the concern that when there's something that looks like it supports reasonable disruption, but we're worried actually what they really have is a hostility to the disruption which is impermissible. One way to address that would be a testing of pretext. As I understand it, the district court here thought there was not enough evidence from which a reasonable jury could find that the stated reason which was disruption-based was not the real reason, assuming there's no... Correct. And the panel's opinion on that, I think, is very... Okay. Two questions on that. In getting to the pretext issue, how does the analysis of pretext work? Is the plaintiff... Is the city responsible for proving that it was not pretextual? It's the plaintiff's burden to show. The plaintiff would have the burden. So, in evaluating... If it was a trial, in summary judgment, it would be... So, they would have to have enough evidence that we would think they could meet their burden on that question, if we thought of it as a pretext question. Okay. Then, second question. The issue arose about the Somerville document and the post, which did not use the term druggie. Correct? Correct. And the testimony... He raised it here. They didn't raise it in their summary judgment. They did not raise that in their summary... In their summary judgment paper. Okay. Thank you. Also, in the briefing, there are many references to the heckler's veto viewpoint discrimination, arguing that that's exactly what the department was engaged in here. How do you distinguish what the department did here, in terms of disciplining Officer Hussey, distinguish between what they did here and the heckler's veto viewpoint discrimination, which I think are used synonymously? I think that's an important distinction to try to draw. How do you draw it? Yeah. He argues in his bank brief that the commissioner and the government can't consider community reactions, and there's no precedent for that. Considering the disruption that would be caused by the lack of trust that is caused by using this term and in that community of people who participate in the... Who have substance issues and their families, that is not a heckler veto. There's nothing in this record to support a claim of... Sorry, to meet his burden, to show a heckler veto situation. And Lucardo, I think, gets into this. It says, taking public perception and ramifications for a loss of trust into account is not a heckler's veto. It is simply an application of the Supreme Court standard, at whether there's a reasonable risk of disruption of government operations. And that's what we have here. There's nothing... The only have here is that some members of the community, some of them were officers in the NAACP, drew this to the attention of the commissioner. That is not evidence that would allow you to find that, ultimately, that was the real reason, because he was trying to appease these individuals, why he gave a four-day, ultimately, unpaid leave to Officer Haase. This is... Thank you. We ask that the court affirm. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Thank you. Jack Bartholet here. A couple of points, and I want to start with a hypothetical that I think shows exactly what we're talking about here. So imagine, if you will, congressional Republicans introduced the Donald J. Trump Sexual Violence Prevention Act, and proposed naming the bill in President Trump's honor. And a police officer posts, this is what it's come to, honoring a rapist, felon, and career philanderer. The future of the go to the police commissioner and say, you know, this officer will be biased against Trump supporters, or through local advocates for restorative justice, come to him and say, this stigmatizes and dehumanizes those with felony records, and means they cannot trust the police department. If this court affirms, that is now enough, and Pickering will never protect even core political speech in which the employer disagrees, because they can find somebody in the community to say, this is bias, this, you know, impacts our trust relationship. My friend said community sentiments dictate whether speech can be protected or not. The First Amendment does not allow the government to enforce majority political opinions and views, and discipline minority views that offend. That is inherent in all of the First Amendment cases. Additionally, we keep talking about whether the term druggie was derogatory, and we've argued extensively, it's not. In context, it's clear that he's saying that he doesn't believe that the bill should be named after somebody that's a druggie. But offense itself is a viewpoint. That's Mattel, that's Brunetti, that's Snyder. Using true, but harsh words to critique the honoree of a bill is a political statement. And the question if he's a citizen, he can do that. There's no question about that. But of course, this is not about that. Because the whole premise of this artifice is speech that's otherwise protected is not because you're a public employee. So all these doctrines run into the question of the case, which is how do we then deal with the Pickering limitation? Otherwise, I agree with you completely. 100% First Amendment protected. What I'm saying is it's not a cognizable disruption interest, for example, that a public employee may rally public support against a public policy stance here by the employer, like a rehabilitative approach to drug use, which wasn't even what he said here. But even if it undermines the department's view that there should be a rehabilitative approach to drug use, in Pickering itself, the employee was saying, the school board, the superintendent, they're messing up this bond issue, their funding of schools is terrible, they're inappropriately curtailing speech about the bond issue. And the Pickering said that that is protected speech, even though it undermines the government, the government employee disruptive of the learning process that the teachers involved with, they said, right. But but the question is, if they said something that would be, would it come out differently? Well, it could undermine trust in the maintenance of schools and the public support. address your colleagues or your opponents statement that the point you made about the Somerville document was not raised in your judgment? Yeah, I don't believe we particularly raised the Somerville one in the summary judgment, we did say there are all these examples. And we say the few so we did make the argument. And I think it's arguments that are waived versus particular evidence in favor of arguments. But you're suggesting you can present new evidence to us? It's not new evidence. But it's it's in the record. But you did you refer to it? I don't believe we particularly cited to it in the motion for summary judgment, suggesting that you generally cited to all the evidence and made clear that you were just giving examples. We did. Yes, we said there was supposed to ferret out whatever other evidence there was, I mean, we provided some but again, we're on summary judgment saying that, you know, they made this decision in a pretextual way. And that should go. Yeah. So but but I do want to one question, because you were on summary judgment or summary judgment. So my question is, is a reasonable risk or prediction of disruption? Is that an issue of fact? Is that an issue of law? It's an issue of law, I would think of it sort of like, you know, like the criminal law context. So what you're saying to me at this time is, it shouldn't be the jury, you know, you know, a district judge should not be giving these instructions to the jury. And then the jury determined if there was a risk of reasonable disruption based on those statements, it should be the district court as a matter of law that's making the determination. Yes, yes, Your Honor. But coming back to judge a firm's question for a second. Rankin has this command that says vigilance is necessary to ensure that public employees, employers do not use authority over employees to silence discourse, not because it hampers public functions, but simply because superiors disagree with the content of employee speech. And I think that gets at this notion of if it was derogatory, do you just get to automatically punish it? But there's a final point, which is courts are required to conduct the balancing. And so we keep talking about was there disruption, was the predictions of disruption reasonable, even if everything they said were true, even if some drug users might somehow learn of this post that he took down after two hours on a private page. And even though there is no evidence of disruption in the six days between when these three people said we don't like this post and no disruption during his entire administrative leave and no after his suspension, even if they could say that there is the implication of trust being undermined, it still needs to be balanced against the First Amendment interest. Here, we could not have stronger First Amendment interest. This is on pending political legislation. This is from somebody who has expertise in this area. This is during a heightened political climate. I mean, this is the crux, of course, political speech in America. And if this decision can stand, it's going to allow employers to discriminate against people with which they disagree. And I just want to end very succinctly. Would you please tell us what is lacking in the record that would have to be there to make this prediction reasonable? The prediction of disruption by which I think the department made it compromise their ability to perform the core functions, which I itemized earlier. What is lacking in the record that makes the prediction of the disruption of the ability to perform those core functions unreasonable? Give us a succinct answer to that because we're going to close with this. Sure. Literally any evidence that it disrupted their operations is lacking. And on top of that, they have to have conducted a reasonable investigation, which they clearly didn't. They need to investigate who made the post and they didn't. And I would just in closing, direct your honors to the Brennan v. Norton quote in our case, which is from the Third Circuit and says, disruption is not the barometer. It's not a checkbox. Is there disruption or not? Even a pluralistic society, there's going to be disruption. Is the disruption outweighing and so injurious to the mission of the employer that it overcomes the level of interest on the other side, which here is the extreme in favor of free speech? And with that, I respectfully ask this court to reverse and remand. Thank you, counsel.